(316 P.3d 162)

No. 110,791

BLUESTEM TELEPHONE COMPANY, *et al.*, *Petitioners/Appellants*,
v. KANSAS CORPORATION COMMISSION, *Respondent/Appellee*,
and SPRINT COMMUNICATIONS COMPANY, L.P., *Intervenor*.

Opinion filed December 12, 2013.

*J. Nick Badgerow*, of Spencer Fane Britt & Browne LLP, of Overland Park, *Mark E. Caplinger*, of Mark E. Caplinger, P.A. of Topeka, *Thomas E. Gleason*,

*Jr.*, of Gleason & Doty, Chartered, of Lawrence, *Colleen R. Harrell*, of James M. Caplinger, Chartered, of Topeka, for petitioners/appellants.

*Dana A. Bradbury* and *Brian G. Fedotin*, of Kansas Corporation Commission, for respondent/appellee.

*Russell S. Jones, Jr., Anthony W. Bonuchi*, and *Michael S. Foster*, of Polsinelli PC, of Kansas City, Missouri, and *Diane C. Browning*, of Sprint Communications Company L.P., of Overland Park, for intervenor.

Before MALONE, C.J., BUSER and BRUNS, JJ.

MALONE, C.J.: Bluestem Telephone Co. and numerous other Kansas Rural Local Exchange Carriers (RLECs) appeal from orders of the Kansas Corporation Commission (Commission) issued during two general investigation dockets. The Commission opened these dockets to explore the impact of proposed new federal regulations relating to the provision of and payment for universal service in the telecommunications industry. The RLECs filed their petition for judicial review in the Washington County District Court. The Commission filed a motion seeking to transfer the case to the Court of Appeals under K.S.A. 66-118a(b), claiming the challenged orders arose from a "rate hearing." The district court agreed and found that this court had exclusive jurisdiction to hear the case.

The threshold issue in this appeal is whether the Court of Appeals has exclusive jurisdiction under K.S.A. 66-118a(b) to hear the RLECs' challenge to the Commission's orders. We conclude this case does not arise from a "rate hearing," nor is it sufficiently like a rate hearing to grant this court exclusive jurisdiction under K.S.A. 66-118a(b). Thus, the district court erred in transferring the case to this court, and we remand to the district court for further proceedings.

### FACTUAL AND PROCEDURAL BACKGROUND

In 2009, Congress directed the Federal Communication Commission (FCC) to ensure Americans had ubiquitous access to broadband service through the National Broadband Plan (NBP). At Congress' direction, the FCC issued a report proposing to change the focus of universal telecommunication services to a broadband infrastructure for many forms of communications, in-

cluding voice communication. The FCC's proposed reforms focused on wireless/mobility, universal service, and intercarrier compensation (ICC). Due to the FCC's initial proposals, the Commission issued an order on September 13, 2011, opening a general investigation docket—No. 12-GIMT-170-GIT (the 12-170 docket)—to explore the impact of the FCC's potential reforms on the Kansas Universal Service Fund (KUSF).

By way of additional background, the KUSF was created by the 1996 Kansas Telecommunications Act, K.S.A. 66-2001 *et seq.* Initially, KUSF funds were paid to replace lost access charge revenues that previously subsidized services provided by Local Exchange Carriers (LECs). Many LECs had charged more for intrastate connections than for interstate connections; thus, the Commission made KUSF payments to the LECs when they were required to bring their intrastate fees into parity with interstate charges. See *Bluestem Telephone Co. v. Kansas Corporation Comm'n,* 33 Kan. App. 2d 817, 819, 109 P.3d 194, *rev. denied* 280 Kan. 981 (2005). After a 3-year transition period, KUSF began shifting to a cost-based fund. For LECs electing to operate under a traditional rate of return regulation (which were primarily rural LECs), all KUSF support was to be "based on such carrier's embedded costs, revenue requirements, investments and expenses." K.S.A. 2012 Supp. 66-2008(e).

Prior to 2011, eligible Kansas LECs also received support from a Federal Universal Service Fund (FUSF) if they operated in a high-cost service area. The Commission would consider the amount of FUSF funds an LEC received when determining the amount of KUSF support that would be paid to that company. Thus, any changes to the FUSF would directly impact the amount of subsidies available for Kansas LECs. One of the Commission's stated purposes for opening the 12-170 docket was to explore changes that would be needed to maintain a KUSF that is " 'not inconsistent with the [FCC's] rules to preserve and advance universal service.' " (Quoting 47 U.S.C. § 254[f] [2006].) Telecommunications carriers operating in Kansas were asked to address a variety of issues the Commission perceived would arise as a result of FCC actions.

On November 18, 2011, the FCC released Report and Order 11-161 (FCC Order) detailing its planned reforms and issuing a notice of proposed rulemaking. The FCC Order acknowledged the Congressional mandate to develop the NBP. To do so, the FCC proposed creating the Connect America Fund (CAF) and the Access Recovery Charge (ARC) as methods to reform universal service funding and to accelerate targeting of subsidies to unserved areas. The FCC also proposed to reform the FUSF to cap growth of subsidies charged to consumers and to reduce inefficiencies it found in the current funding mechanisms. Finally, the FCC proposed to reform the FUSF to promote broadband deployment and to reform the ICC scheme. The FCC Order marked a fundamental shift in the FUSF and ICC systems previously used at the federal level.

As part of the FCC's reformation of the ICC scheme, LECs were ordered to cap intrastate terminating access rates to interstate levels. Consequently, the Commission opened a separate industry-wide docket—No. 13-GIMT-004-GIT (the 13-004 docket)—on July 12, 2012. Following staff recommendations, the Commission ordered Kansas RLECs to file specific reports delineating between each RLEC's originating intrastate access rates and the RLEC's terminating intrastate access rates. In addition, the Commission requested comments from the parties on a variety of related issues. In its order, the Commission determined that the RLECs could receive an increase or decrease from the KUSF for part of 2013 due to adjusting intrastate access to parity but that after June 30, 2013, any recovery or reduction related to terminating access charges would be removed from KUSF and recovered via the federal ARC set forth in the FCC Order.

The RLECs filed their access reduction calculations with the Commission in August 2012, and these were ultimately accepted. The RLECs also filed comments taking issue with the Commission's indications that they would not be receiving KUSF payment for losses caused by capping terminating access recovery and that any revenue recovery would be transferred to ARC. For the sake of administrative efficiency, the Commission ordered in September 2012 that any issues relating to KUSF reimbursements would be

transferred to the 12-170 docket. RLECs were required to file revised tariffs containing the new intrastate access rates by May 31, 2013.

Meanwhile, telecommunication carriers and the Commission were focusing on addressing FUSF and ICC reforms in the 12-170 docket. In April 2013, the Commission took official notice of H.B. 2201 adopted by the Kansas Legislature and signed by the governor. See L. 2013, ch. 110. H.B. 2201 created a Telecommunications Study Committee, took steps to deregulate telecommunications in Kansas, and made changes to distributions from KUSF.

On May 29, 2013, the Commission released its order and decision in the 12-170 docket. The Commission found that the enactment of H.B. 2201 addressed many of the issues the parties had briefed. Based on part of this legislation, the Commission found the KUSF support could not be provided to rate-of-return LECs to offset any loss of FUSF support. The Commission order also discussed the reforms set out in the FCC Order, which it characterized as a transition to a bill-and-keep regime for ICC by reducing some ICC rates and providing some carriers with new revenue recovery mechanisms, the ARC and CAF. The Commission found that the FCC's intent was to transition to more fiscally responsible programs, rejected the idea that ICC reforms should be revenue neutral, and found the reforms were geared toward minimizing the overall universal services burden on businesses and consumers.

The Commission also discussed the effect of the FCC Order on K.S.A. 66-2005(c)(1) as amended by H.B. 2201, which provides: "Any reduction of a rural telephone company's cost recovery due to reduction of its intrastate access revenue, except such revenue recovered from another support mechanism, shall be recovered from the KUSF." L. 2013, ch. 110, sec. 8. The RLECs had argued that this statute entitled them to recover support for lost intrastate access revenue beyond any funding provided by ARC and CAF. The Commission disagreed and stated:

"The Commission concludes the FCC Order preempts K.S.A. 66-2005(c)(1)'s language that any reduction to intrastate access revenue . . . shall be recovered from the KUSF. Any interpretation of K.S.A. 66-2005(c)(1) that requires the KUSF to make up any revenue shortfall resulting from the FCC-required reduc-

tion of its intrastate terminating access revenue would defeat the objectives of the FCC Order. Accordingly, the FCC preempts such interpretation."

Finally, the Commission focused on K.S.A. 2012 Supp. 66-2008(e) that directs KUSF support for RLECs to be "based on such carrier's embedded costs, revenue requirements, investments and expenses." The Commission determined that the statute did not require KUSF to be based on all embedded costs and that KUSF did not need to cover all of those costs and expenses. Specifically, the Commission stated:

"The Commission finds 'based on embedded costs' does not mean KUSF support must cover all embedded costs, revenue requirements, investments and expenses. Instead, embedded costs, revenue requirements, investments and expenses must merely serve as a basis for determining KUSF support. In other words, the Commission must use embedded costs, revenue requirements, investments and expenses as the starting point in determining KUSF support, but KUSF support does not need to cover all those costs and expenses."

On May 31, 2013, the Commission released its order and decision in the 13-004 docket. In that order, the Commission approved the intrastate access rates and revenues submitted by the RLECs and adopted staff's recommendation "of a net, aggregate reduction to the KUSF in the amount of $652,164 as a result of the intrastate originating access rate and revenue adjustments."

The RLECs filed petitions for reconsideration in both dockets challenging the Commission's orders pertaining to KUSF offsets and reimbursement changes. Significantly, the RLECs admitted the accuracy of the calculations of changes in intrastate access revenue and did not dispute the amounts reflected in their tariffs. The Commission denied both petitions for reconsideration. In doing so, the Commission upheld its ruling relating to the preemption of K.S.A. 66-2005(c)(1) as amended by H.B. 2201 and its interpretation of K.S.A. 2012 Supp. 66-2008(e).

On July 25, 2013, the RLECs (Petitioners) filed a timely petition for judicial review from both Commission orders in Washington County District Court. The Petitioners challenged only the Commission's orders pertaining to KUSF offsets and reimbursement changes. The Petitioners requested that those orders be overturned and also requested injunctive relief.

On August 14, 2013, the Commission filed a motion to transfer the case to the Court of Appeals, asserting that the orders on appeal directly impacted rates and therefore fell within this court's exclusive jurisdiction under K.S.A. 66-118a(b). The Commission admitted that neither docket was a formal rate proceeding but argued that each docket was sufficiently like a rate hearing for purposes of this court's jurisdiction. The Commission also cited this court's expertise in addressing ratemaking proceedings and the expedited process imposed on this court. The Petitioners opposed the motion to transfer, arguing that the Commission orders did not arise from a "rate hearing" and the mere fact that the orders might indirectly impact rates was insufficient to deprive the district court of jurisdiction. Sprint filed a motion to intervene in the action, which the district court ultimately granted, and Sprint joined the Commission's motion to transfer.

On October 16, 2013, the district court issued an order transferring the case to the Court of Appeals, finding "that the underlying agency action was a policy decision that directly affects rates, therefore the Court of Appeals has exclusive jurisdiction to decide this matter under K.S.A. 66-118a(b)." Petitioners docketed the appeal with this court on November 15, 2013.

## JURISDICTION UNDER K.S.A. 66-118a(b)

Upon the docketing of this appeal, this court issued a show cause order asking the parties to address this court's jurisdiction. The show cause order noted that "we find that there are serious questions whether the matter on appeal arises from a 'rate hearing' as defined in K.S.A. 66-118a(b) as interpreted in prior cases in the appellate courts." The parties were ordered to show cause by written response why this case should not be remanded to the district court for further proceedings.

The Commission responded to the show cause order and argued that the district court properly transferred this case to the Court of Appeals based on K.S.A. 66-118a(b), which gives this court exclusive jurisdiction "to review any agency action of the state corporation commission arising from a rate hearing." The Commission argued that this court's prior decisions "collectively adopt a broad

definition of the phrase 'arising from a rate hearing' " found in K.S.A. 66-118a(b). The Commission noted that this case "involves two large dockets dealing with the highly technical field of telecommunications and the interaction between the FCC and State law. These dockets involve the type of complex and highly technical issues . . . over which this Court has developed an expertise."

Sprint responded to the show cause order and also argued that this court has exclusive jurisdiction under K.S.A. 66-118a(b). Sprint argued that this court "has repeatedly held that K.S.A. 66-118a(b) vests exclusive jurisdiction in the Court of Appeals if the Commission's order impacts rates or sets them." Sprint argued that the Commission's rulings in this case directly impact the petitioners' rates and revenues; thus, this case is sufficiently "like" a rate case for this court to exercise exclusive jurisdiction under K.S.A. 66-118a(b).

The Petitioners responded to the show cause order and argued that this court does not have exclusive jurisdiction under K.S.A. 66-118a(b). The Petitioners argued that under the plain language of the statute, the district court should conduct judicial review in accordance with K.S.A. 77-609 because the agency action being challenged did not arise from a rate hearing. The Petitioners distinguished prior decisions of this court relied upon by the Commission and by Sprint that have adopted a broad definition of the phrase "arising from a rate hearing" found in K.S.A. 66-118a(b).

An appellate court may exercise jurisdiction only under circumstances allowed by statute. *Kansas Medical Mut. Ins. Co. v. Svaty*, 291 Kan. 597, 609-10, 244 P.3d 642 (2010). Also, an appellate court has a duty to question jurisdiction on its own initiative. *Ryser v. State*, 295 Kan. 452, 456, 284 P.3d 337 (2012). Whether jurisdiction exists is a question of law over which an appellate court has unlimited review. *Frazier v. Goudschaal*, 296 Kan. 730, 743, 295 P.3d 542 (2013). Moreover, to determine whether this court has jurisdiction, we are required to interpret K.S.A. 66-118a(b). Interpretation of statute is a question of law over which an appellate court has unlimited review. *Milano's Inc. v. Kansas Dept. of Labor*, 296 Kan. 497, 500, 293 P.3d 707 (2013).

The parties agree that this court's jurisdiction over this appeal is governed by K.S.A. 66-118a(b), which states:

"The court of appeals shall have exclusive jurisdiction to review any agency action of the state corporation commission *arising from a rate hearing* requested by a public utility or requested by the state corporation commission when a public utility is a necessary party. Proceedings for review of other agency actions of the state corporation commission shall be in accordance with K.S.A. 77-609 and amendments thereto." (Emphasis added.)

Under this statute, the Court of Appeals has exclusive jurisdiction to review the Commission's order only if it "aris[es] from a rate hearing." The district court has jurisdiction over any other appeals from Commission orders in accordance with the Kansas Judicial Review Act. See K.S.A. 77-601 *et seq*. Thus, if the Commission's orders herein arose from a rate hearing, then the case should have been filed in the Court of Appeals, and the case was properly transferred here by the district court. But if the Commission's orders did not arise from a rate hearing, then the appeal was properly filed in district court pursuant to K.S.A. 66-118a(b).

The most fundamental rule of statutory construction is that the intent of the legislature governs if that intent can be ascertained. *Bergstrom v. Spears Manufacturing Co.*, 289 Kan. 605, 607, 214 P.3d 676 (2009). An appellate court must first attempt to ascertain legislative intent through the statutory language enacted, giving common words their ordinary meanings. *Northern Natural Gas Co. v. ONEOK Field Services Co.*, 296 Kan. 906, 918, 296 P.3d 1106 (2013).

When a statute is plain and unambiguous, an appellate court does not speculate as to the legislative intent behind it and will not read into the statute something not readily found in it. *In re Tax Appeal of Burch*, 296 Kan. 713, 722, 294 P.3d 1155 (2013). Where there is no ambiguity, the court need not resort to statutory construction. Only if the statute's language or text is unclear or ambiguous does the court use cannons of construction or legislative history to construe the legislature's intent. *Northern Natural Gas Co.*, 296 Kan. at 918.

Turning to the case at hand, the Petitioners are challenging orders of the Commission issued during two general investigation

dockets. We will briefly address the Commission's authority to supervise public utilities doing business in Kansas and review some of the types of hearings that come before the Commission. The Commission is given full power, authority, and jurisdiction to supervise and control public utilities doing business in Kansas, and "is empowered to do all things necessary and convenient for the exercise of such power, authority and jurisdiction." K.S.A. 66-101. Under this broad authority, the Commission carries out a number of functions and utilizes a number of different types of dockets and hearings to carry out its various functions.

A public utility initiates a "traditional" rate case under K.S.A. 66-117(a) by proposing a change in its rates, tolls, or charges. The Commission may then give notice and hold a hearing upon such proposed changes. K.S.A. 66-117(b). The Commission's regulations require public utilities to file detailed documentation and prefiled testimony to justify any change in rates. See K.A.R. 82-1-231. Appeals from the Commission's orders in these types of cases unquestionably are filed with this court. See, e.g., *Kansas Industrial Consumers Group, Inc. v. Kansas Corporation Comm'n*, 36 Kan. App. 2d 83, 138 P.3d 338, *rev. denied* 282 Kan. 790 (2006) (various consumers appealed from Commission order granting electric utility net revenue increase).

Historically, this court has not limited its exclusive review of Commission orders to "traditional" rate cases. As the Commission and Sprint point out, prior decisions have broadly interpreted our court's exclusive jurisdiction under K.S.A. 66-118a(b). These prior cases fall into three general categories: (1) appeals of Commission orders involving tariff rate changes designed solely to increase a public utility's revenues; (2) appeals of Commission orders from generic dockets that are closely related to prior rate cases or involve rate-like issues; and (3) appeals of Commission orders requiring individual LEC audits to determine the LEC's entitlement to support from the KUSF.

The first category of cases applying a broad interpretation of K.S.A. 66-118a(b) includes appeals of Commission orders involving tariff rate changes designed solely to increase a public utility's revenues. For example, in *MAPCO Intrastate Pipeline Co. v. Kansas*

*Corporation Comm'n*, 10 Kan. App. 2d 527, 704 P.3d 989 (1985), this court exercised jurisdiction under K.S.A. 66-118a(b) because the pipeline company had filed to increase its tariff rates. Even though the pipeline company had not initiated its process with the elaborate documentation of a "traditional" rate case, its proposed tariff changes "dealt only with new rates designed to produce higher revenues." 10 Kan. App. 2d at 531.

The second category of cases applying a broad interpretation of the statute includes appeals of Commission orders from generic dockets that are closely related to prior rate cases or involve rate-like issues. For example, in *Kansas Gas & Electric Co. v. Kansas Corp. Comm'n*, 14 Kan. App. 2d 527, 794 P.2d 1165, *rev. denied* 247 Kan. 704 (1990), the Commission ordered the utility to refund customers nearly $7 million as part of a general investigation docket examining the utility's prudence in managing its facilities during temporary shutdowns of its nuclear power plant. This court found the proceeding was closely related to a prior rate case that allowed the utility to use a retail energy cost adjustment (ECA) clause, and the issues on appeal dealt with the relevance of the ECA clause in determining the proper refund to consumers. 14 Kan. App. 2d at 530. The court also noted that the tariff at issue was similar to a rate schedule. 14 Kan. App. 2d at 530.

Another example of this second category of nontraditional rate cases can be found in *Citizens' Utility Ratepayer Bd. v. Kansas Corporation Comm'n*, 24 Kan. App. 2d 63, 64-66, 941 P.2d 424, *rev. denied* 262 Kan. 959 (1997). In that case, the Commission opened a general investigation docket to determine what Southwestern Bell Telephone Company (SWBT) could charge in interconnection agreements with other telecommunication companies entering the market. This court noted that the docket was treated by the Commission as a rate hearing and established a specific price SWBT could charge to its competition for access to its network. 24 Kan. App. 2d at 64-65. That price was based on SWBT's costs of providing the interconnection or network element, plus a reasonable profit, *i.e.*, traditional ratemaking calculations. 24 Kan. App. 2d at 65.

The third category of cases applying a broad interpretation of K.S.A. 66-118a(b) includes appeals of Commission orders requiring individual LEC audits to determine the LEC's entitlement to support from the KUSF. For example, in *Columbus Telephone Co. v. Kansas Corporation Comm'n*, 31 Kan. App. 2d 828, 75 P.3d 257 (2003), the Commission conducted an audit of a rural LEC to determine what KUSF support, if any, the LEC would be entitled to receive under K.S.A. 66-2008(e). This court noted that the case was handled before the Commission using the same procedures that would apply in a traditional rate case. The prefiled testimony included evidence of the LEC's rate base, operating income, rate of return, plant investment, depreciation, working capital, cost of capital, and taxes. This court found the audit was "sufficiently like a standard rate hearing to serve the purpose of the statute." 31 Kan. App. 2d at 833.

Although prior decisions of this court have applied a broad interpretation of K.S.A. 66-118a(b), the mere fact that a Commission order from a general investigation docket ultimately may impact rates is not a basis for exclusive Court of Appeals jurisdiction under the statute. Undeniably, the Commission's order in the 12-170 docket ultimately will impact rates consumers pay to their carriers (whether they are the RLECs or their competitors), as carriers are charged a specific amount per line to fund the KUSF and pass on those charges to their customers. But the Commission's order in the 12-170 docket being challenged by the Petitioners addresses the effect of new federal regulations on KUSF payments and establishes an industry-wide cost methodology for distributing those payments to RLECs. The order does not determine the amount of KUSF payments that will be available to individual RLECs, and the order does not set the rates for services that any individual RLEC can charge to its customers.

The Commission points out that the order in the 13-004 docket approved intrastate access rates for part of 2013 submitted by individual RLECs. But the Petitioners are not challenging that part of the order. The Petitioners do not challenge the calculations used to establish their tariffs or the capping of intrastate terminating rates, *i.e.*, traditional ratemaking calculations. The only part of the

order in the 13-004 docket being challenged on appeal relates to the KUSF reimbursements.

As the Petitioners argue, every decision of the Commission ultimately has an "impact" on rates in one way or another. Thus, to accept the argument being asserted by the Commission and Sprint would mean that *every* Commission decision would be appealable directly to the Court of Appeals rather than to the district court. But K.S.A. 66-118a(b) does not grant this court exclusive jurisdiction to review a Commission order from a general investigation docket simply because the order ultimately may impact rates charged to consumers. Such an interpretation would render the statute meaningless.

The Commission and Sprint cite *Citizens' Utility Ratepayer Bd. v. Kansas Corporation Comm'n* for the proposition that Court of Appeals jurisdiction under K.S.A. 66-118a(b) is not limited to "traditional" rate cases. In that case, as discussed above, the Commission opened a general investigation docket to determine what SWBT could charge in interconnection agreements with other telecommunication companies. Interestingly, the Commission argued before this court that the case did *not* arise from a rate hearing and instead sought to transfer the case to the district court. 24 Kan. App. 2d at 64. But this court found that this argument "ignore[d] several statements in the record which characterize this proceeding as a rate hearing." 24 Kan. App. 2d at 64.

As this court noted, several telecommunication carriers instituted the proceeding to "determine the prices SWBT could charge for services" under the interconnection agreements. 24 Kan. App. 2d at 64. In contrast, the present case was not brought to determine or set the rates or prices which the Petitioners can charge *to* their customers for their services. Instead, this case is focused on a methodology to determine what funds the Petitioners will receive *from* the State under the mandated KUSF program as affected by recent FCC regulations. Also, the Commission's order in *Citizens' Utility Ratepayer Bd. v. Kansas Corporation Comm'n* affected only SWBT, whereas the Commission's orders herein establish industry-wide standards for distributing KUSF payments.

The Commission and Sprint also cite *Columbus Telephone Co. v. Kansas Corporation Comm'n*. In that case, this court found that, according to the available legislative history, its exclusive jurisdiction in appeals from rate hearings served three purposes: (1) It shortened the appeal process; (2) it eliminated utilities' ability to file appeals in any county where the Commission order became effective; and (3) it allowed this court to develop an expertise in handling rate proceedings that are typically complex and highly technical. 31 Kan. App. 2d at 833. The Commission and Sprint argue that these purposes would be served if this court hears the present appeal.

But despite these purposes, it is clear the legislature did not intend to bypass the district court in every appeal of a Commission order. In a traditional rate case, a utility's proposed rates become effective within 30 days after the application materials are filed unless timely suspended by the Commission. See K.S.A. 66-117(a) and (c). If suspended, the Commission has only 240 days to compile pleadings, testimony, and documentation and then make a decision. See K.S.A. 66-117(c). By filing a rate case, the utility is claiming that it is not earning sufficient revenue to provide its monopolized service, and prompt decision-making is necessary. Thus, under K.S.A. 66-118a(b), these types of cases are expedited before the Court of Appeals.

Here, the Commission was utilizing general investigation dockets that contained no statutory time limit. The 12-170 docket had been pending more than 20 months before the Commission issued its initial decision; the 13-004 docket had been pending 10 months before the challenged order was filed. The order in the 12-170 docket, which is the heart of this appeal, merely sets forth an industry-wide cost methodology for KUSF payments without individual determinations of what KUSF payments would be available to each company. This case is clearly distinguishable from *Columbus Telephone Co.*, which involved an evaluation of an individual LEC's embedded costs and revenue requirements that were processed under the timeline of a "traditional" rate case.

We note that in an earlier proceeding involving some of the same parties to this appeal, the Commission never challenged the juris-

diction *of the district court* to review Commission orders from generic dockets addressing industry-wide cost methodologies for distributing KUSF payments. In *Bluestem Telephone Co. v. Kansas Corporation Comm'n*, the Commission issued an order in several general investigation dockets determining that KUSF funds would be distributed to RLECs on a per-line basis. The RLECs appealed to the district court, which reversed the Commission's order finding it was contrary to statutory language regarding KUSF payments being based upon an individual company's embedded costs. This court agreed with the district court's interpretation of the statute in question. 33 Kan. App. 2d at 818. The prior *Bluestem* case supports the proposition that jurisdiction for the present appeal initially lies in the district court rather than the Court of Appeals.

The Commission further argues that this case was properly transferred to this court because it deals "with the highly technical field of telecommunications" and involves issues over which this court has developed an expertise. While this court has developed some degree of expertise in handling utility rate cases, that expertise is based on addressing the more traditional ratemaking functions. See, *e.g.*, *Western Resources, Inc. v. Kansas Corporation Comm'n*, 30 Kan. App. 2d 348, 42 P.3d 162, *rev. denied* 274 Kan. 1119 (2002) (utility challenging order imputing off-system sales revenues and calculating plant depreciation); *Aquila, Inc. v. Kansas Corporation Comm'n*, No. 94,326, 2005 WL 1719705 (Kan. App. 2005) (unpublished opinion) (addressing Commission's order using an aggregated capital structure for corporation and the utility division and the return on equity elements).

In contrast, this appeal raises straightforward legal issues involving statutory interpretation and federal preemption. Such issues are well within the expertise and skills of any district judge in Kansas. While it might be more convenient for the Commission to handle appeals only in this court, the legislature has not limited the venues in which the Commission must handle nonrate hearing appeals. See K.S.A. 66-118a(b) (orders from nonrate hearings governed by K.S.A. 77-609); K.S.A. 77-609(b) (venue is in the county in which the agency action is entered or is effective).

In summary, this case does not arise from a "rate hearing," nor is it sufficiently like a rate hearing to grant this court exclusive jurisdiction under K.S.A. 66-118a(b). The Commission orders being challenged by the Petitioners address the effect of new federal regulations on KUSF payments and establish an industry-wide cost methodology for distributing those payments to RLECs. The orders do not determine the amount of KUSF payments that will be available to individual RLECs, and the orders do not set the rates for services that any individual RLEC can charge to its customers. K.S.A. 66-118a(b) does not grant this court exclusive jurisdiction to review a Commission order from a general investigation docket simply because the order ultimately may impact rates that a public utility charges to consumers. Thus, we conclude that the Commission orders being challenged by the Petitioners do not arise from a rate hearing within the meaning of K.S.A. 66-118a(b), and we remand this case to the district court for further proceedings.

Remanded to district court for further proceedings.